**Affirmed and Memorandum Opinion filed November 13, 2018.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-00427-CV

---

## IN THE INTEREST OF C.W., D.T., J.T., AND A.T., CHILDREN

---

**On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Cause No. 88637-F**

---

## M E M O R A N D U M   O P I N I O N

In this accelerated appeal, a mother seeks reversal of the trial court's final judgment terminating her parental rights to three young children. She challenges the legal and factual sufficiency of the evidence to support the trial court's findings on two predicate grounds and its finding that termination is in the best interest of the children. We affirm.

### I.     FACTUAL AND PROCEDURAL BACKGROUND

A.W. ("Mother") and D.T. ("Father") are the natural parents of D.A.T. ("Devin"), J.R.T. ("Jamie"), and A.E.T. ("Alice"), the three young children subject

to this termination suit.[1] Mother has two other children, C.W. ("Claire") and K.L. ("Kevin") who are not subject to this suit.[2] The trial court determined the parental rights of Mother should be terminated as to Devin, Jamie, and Alice. The trial court found Father had endangered the children, but that it was not in the children's best interest to terminate his parental rights. Father has not appealed.

## A. Pretrial Removal Affidavit

On June 6, 2016, the Department of Family and Protective Services ("the Department") received a referral alleging neglectful supervision of Claire, Devin, Jamie, and Alice by Mother because Mother tested positive for benzodiazepines at the hospital after giving birth to Alice. Mother admitted to having an opiate addiction and to taking suboxone. On July 24, 2016, the Department received another referral alleging neglectful supervision of Claire, Devin, Jamie, and Alice by Mother and Father. The intake referral alleged Claire told a neighbor that someone was attempting to break into their home. According to the affidavit, Father was the alleged intruder. Three days later, the Department received a third referral of neglectful supervision. The intake referral alleged the children were often left home alone. The referral further alleged that the parents associated with known drug users and had been seen smoking marijuana. Law enforcement discovered Alice, then a one-month old infant, and Jamie, a twenty-month old toddler, home alone on this occasion. Mother returned shortly after law enforcement arrived. The Department transferred the case to Family Based Safety Services after this report.

On September 22, 2016, Mother was arrested for three felony drug charges,

---

[1] We use pseudonyms to refer to appellant, the children, and other family members. *See* Tex. Fam. Code Ann. § 109.002(d) (West 2014); Tex. R. App. P. 9.8.

[2] Claire was originally a part of this suit, but the trial court severed the investigation relating to Claire from this suit.

leaving Devin, Jamie, and Alice in the sole care of Father. During this time Claire was in the care of her maternal grandmother ("Grandmother"). Kevin was not yet born. While staying with Grandmother, Claire was unable to attend school because Mother refused to sign school enrollment forms. The Department's caseworker attributed Mother's actions in not signing the enrollment forms as retaliation against Grandmother for not bonding Mother out of jail.

On October 3, 2016, the Department received a referral of neglectful supervision of Devin, Jamie, and Alice by Father. The intake referral alleged Father's sister ("Aunt") discovered Father unconscious in his vehicle with his three children. The children were dirty, wet, and in need of attention. Father was charged with three counts of child endangerment and immediately taken into custody.

The next day, the Department filed a petition for protection, conservatorship, and termination. In the petition, the Department sought an emergency order to gain possession of the children. Grandmother and Aunt were unable to care for the three children on this date. Mother and Father were incarcerated. The children were placed with foster families.

## B.    Trial

During the trial, the Department introduced the following evidence concerning Mother: (1) the grand jury indictment charging that on September 22, 2016, Mother possessed methamphetamine, Mother's plea agreement for these charges, Mother's order of deferred adjudication for these charges, and Mother's deferred adjudication compliance report; (2) the grand jury indictment charging that on July 11, 2017, Mother exploited an elderly person; (3) Mother's family service plans; (4) the arrest warrant from Mother's September 22, 2016 arrest; (5) the police officer's body camera video from Mother's September 22, 2016 arrest; (6) Mother's psychological evaluation; and (7) Mother's substance-abuse assessment.

3

At trial, Officer Ashley Harper of the West Columbia Police Department testified about an incident with Mother on October 23, 2017. On that date, Officer Harper was dispatched to a hotel where she found Mother arguing with the hotel's owners. The owners informed Officer Harper that Mother had not paid for a room and they wanted her to leave the premises. Officer Harper tried to assist Mother in vacating the property, but Mother's speech was slurred, and she had difficulty walking. Mother was unable to answer Officer Harper's questions. Mother was making phone calls on her cell phone requesting her "medicine." Officer Harper smelled alcohol on Mother's breath and placed her under arrest for public intoxication.

Ruth Olaniyan, a substance-abuse counselor, testified she provided substance-abuse counseling to Mother and Father. Olaniyan found Mother to be aggressive. Mother was not forthcoming in discussing her substance-abuse issues. Father told Olaniyan about Mother's suboxone use, which Mother denied when Olaniyan confronted her. Olaniyan discharged Mother after Mother cancelled an appointment without rescheduling.

William Mossbarger of the Brazoria County Adult Probation Department testified that Mother was under probation because she entered a "guilty" plea to the September 22, 2016 charges of possession of a controlled substance. At this point in the trial, Mother's plea agreement, order of deferred adjudication, and compliance report were admitted into evidence. The compliance report reflects Mother's deferred adjudication began on March 16, 2017. The report shows Mother had not provided a licensed chemical dependency report or completed any community service. According to Mossbarger, Mother was unable to complete her community service because she became pregnant with her fifth child, Kevin.

Mossbarger testified that Mother had checked in with him monthly except for

4

December 2017 and February 2018. Mother told Mossbarger that she did not contact him in February 2018 because there was a warrant out for her arrest. In her discussions with Mossbarger, Mother denied drug abuse. Mother admitted to taking two prescription drugs and provided Mossbarger with a copy of the prescription for one of these drugs. Mother did not have a prescription for an opioid-based pain medication she was taking.

Mossbarger testified that he filed a motion to adjudicate Mother's guilt because he discovered there was a warrant out for her arrest. The warrant was for a charge of exploitation of elderly occurring while Mother was on probation.

Next, the Department's caseworker, Shannon Sanders, testified that she became involved with the family in October 2016, when Father was arrested for child endangerment and Mother was incarcerated. According to Sanders, there were two intakes in 2015 stemming from alleged physical neglect in connection with the parents being in and out of jail, unsanitary home conditions, and concerns with the parents' prescription drug use. Sanders further testified that one of the 2015 allegations stated Mother was "high" and suicidal. Devin and Jamie were removed from the home at this time and Mother was ordered to complete family services. The children were returned home after Mother passed her drug tests and completed her services. Jesse Deadman, a Department caseworker, testified about the December 2015 allegation of neglectful supervision. He had visited Mother in a detox cell at the Freeport Police Department, where she was being held for public intoxication. Mother was standing in the cell banging her head against the wall when Deadman arrived. Mother was unable to speak coherently during the visit. Because both parents were incarcerated at this point, the Department placed Devin and Jamie in foster care.

At the time of trial, Mother was incarcerated. During her trial testimony, she

admitted to having been incarcerated six times since 2009. Mother also admitted the charges resulting in her incarceration include failure to identify, having an unrestrained child under the age of five in a vehicle, possession of controlled substances, and assault by threat. Mother acknowledged that she had been arrested twice for public intoxication. Mother did not know when she would be released from jail on her current charges.

Mother testified that she did not have a vehicle during much of the investigation, making it difficult for her to meet the requirements of her service plan. Mother also had trouble regularly attending the visits with her children because she did not have reliable transportation. According to Mother, she completed her psychological evaluation, parenting classes, and a substance-abuse assessment. Mother stated she has a great deal of love and affection for her children and that Grandmother has a "great relationship" with them.

Mother explained that, despite Father's having been charged with three counts of child endangerment, she believed Father was a good caretaker for the children. Mother admitted to not having obtained prenatal care for her pregnancy with Alice. Mother also admitted to using methamphetamines at the time of her September 2016 arrest. Mother stated that she was not a good role model for her children because she was incarcerated but believed that she could become a good role model upon her release from jail.

Father testified, denying having been under the influence of any substance when the children were found in his vehicle. Before his incarceration for child endangerment, he was incarcerated for two violations of probation, theft of a firearm, possession of marijuana, possession of a controlled substance, and burglary of a vehicle. Father had been incarcerated for approximately half of Jamie's life and half of Alice's life. He was renting a home where he lived with Mother's son, Kevin, a

6

seven-month-old baby of whom he is not the natural parent. Father stated he did not have a substance-abuse problem and that he had been sober for seven months and was attending Narcotics Anonymous meetings. Father testified that he did not believe Mother had a substance-abuse problem.

Aunt testified about the incident on October 3, 2016, which resulted in the children being removed from the home. Aunt explained that on or around October 2, while Father was the sole caretaker of the three children, Father asked Aunt if she could "help him out with money." Aunt testified that she was not willing to give Father money at this time because she believed Father and Mother had a drug problem. Instead, Aunt offered to bring food and supplies for the children because Father said the children had only one cup of soup for the three of them. This occasion marked the third time the Aunt had brought the family food and supplies.

Aunt testified that when she arrived at the home, she saw Father's truck parked outside and noticed the vehicle was running. Aunt looked inside and saw Father passed out in the front seat and Devin naked inside the vehicle. Despite Aunt's efforts, she could not wake Father. Alice, who was three months old at this time, lay in the passenger side of the vehicle with a thick pink blanket covering her entire body, including her face. The infant was "completely soaked," in sweat, urine, or both. Aunt found Jamie asleep under a seat in the vehicle. She woke Jamie and put her in the front seat, where Devin had defecated. Aunt ran back to her own vehicle with Alice to gather diapers and wipes for Jamie and Devin. When Aunt returned to Father's vehicle, she saw Jamie eating Devin's feces.

Aunt continued trying to wake Father without success. At one point, Father briefly woke and mumbled that he had taken a Suboxone. Aunt testified that the only other time she had seen Father in a similar condition was when she visited him at the hospital after he had smoked synthetic marijuana. After Aunt secured the children

7

in her vehicle, she called 911. Father was taken into custody and charged with three counts of child endangerment. Aunt cared for the children for a week, but ultimately determined she could not care for the three children and her own daughter.

Aunt further testified she was concerned for her nieces and nephew because of Father's and Mother's chaotic relationship. Aunt testified that Mother would send her threatening text messages when Mother and Father were fighting.

The Department's caseworker, Naquita Paul, testified that Mother did not complete the family services ordered in 2016 and was discharged unsuccessfully from three counseling programs due to her failure to complete a drug and alcohol assessment. According to Paul, on one occasion Mother left the drug-testing facility because the line was too long, and, on another occasion, she said she was unable to urinate and refused to drink the water offered because she said it was "nasty." Mother also was discharged from individual therapy for failure to attend and for being argumentative with the counselor.

Paul stated that Mother was not consistent in her visitation with the children. She recounted an incident in which Mother did not show up to the meeting place and left the children waiting for her. Paul testified that she did not believe Mother could provide a safe and stable home. Paul explained that Mother had provided three or four different home addresses in the course of the one-and-half-year investigation. She knew Mother to have had only one job — lasting one month —during the investigation. Paul testified that she believed termination of Mother's and Father's parental rights would be in the best interest of Devin, Jamie, and Alice. Paul stated the circumstances of the family had not improved since the investigation began.

According to Paul, Jamie's speech was developmentally delayed. Paul testified that Jamie's foster parents enrolled her in speech therapy, which Paul stated had improved Jamie's speech. During visits with her parents, Jamie would run away

and sit by herself. Jamie would not take direction from Father and did not interact with Mother. Paul testified that Jamie's behavior was different in the care of her foster parents.

Paul also testified about her interaction with Grandmother, who had moved four times during the course of the investigation. At the time of trial, Grandmother was caring for Claire. Paul visited the home on a monthly basis to check on Claire. According to Paul, Grandmother's home was appropriate for Claire. Finally, Grandmother testified. During the course of the investigation, Grandmother had moved between a camper, two different motels, and an apartment. Grandmother planned to move again when she became able to purchase a mobile home. Grandmother stated that she has not had the space for all three of the children but will be able to care for them when she secures the mobile home. Grandmother testified that she is willing to keep the children for as long as it takes for Mother and Father "to get on their feet."

Following arguments by counsel, and the guardian ad litem's recommendation that Mother's rights be terminated, the court determined Mother's parental rights should be terminated pursuant to the predicate findings under Family Code sections 161.001(b)(1)(E) and (O) and appointed the Department as sole managing conservator. The court approved the children's placement in their foster home but noted that the court would not rule out future placement with Grandmother or Father. On May 21, 2018, the trial court signed a final decree for termination, which stated termination of Mother's parental rights was in the children's best interest.

## II.   ANALYSIS

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1); and (2)

termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2) (West Supp. 2016); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Mother raises three issues on appeal. In her first and second issues, Mother challenges the trial court's findings under sections 161.001(b)(1)(E) and (O) of the Texas Family Code. In her third issue, Mother challenges the trial court's finding that termination of her parental rights is in the children's best interest.

## A. Standard of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Despite the constitutional magnitude of parental rights, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."). Due to the severity and permanency of the termination of parental rights, the law imposes a heightened burden of proof, requiring clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a termination case, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that

its finding was true. *See In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id*. at 109.

## B.    Predicate Termination Grounds

The trial court found Mother "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). A child is endangered when the environment creates a potential for danger of which

11

the parent is aware of yet disregards. *In re S.M.L.*, 171 S.W.3d at 477.

Termination under subsection 161.001(b)(1)(E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re C.J.S.*, 383 S.W.3d 682, 688 (Tex. App.— Houston [14th Dist.] 2012, no pet.); *see also In re J.O.A.*, 283 S.W.3d at 336 (holding endangering conduct is not limited to actions directed toward the child). Danger to the child's well-being may be inferred from parental misconduct alone, and courts may look at parental conduct both before and after the child's birth. *Id.* ("[T]he endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage."). The conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed by the Department." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The Department contends Mother's history of substance abuse, incarceration, and criminal activity all support a finding of endangerment under subsection (E). Mother asserts the Department failed to produce clear and convincing evidence that she engaged in a voluntary, deliberate, and conscious course of conduct that endangered the physical and emotional well-being of the children because the Department did not remove the children as a result of a direct act of Mother.

As a general rule, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re J.O.A.*, 283

S.W.3d at 345. Although incarceration alone will not support termination, evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection (E). *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Likewise, illegal drug use may support termination under subsection 161.001(b)(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617. A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *In re E.R.W.*, 528 S.W.3d at 264-65.

The record contains ample evidence of Mother's history of endangering Devin, Jamie, and Alice. At Alice's birth, Mother tested positive for benzodiazepines. Mother also admitted to having an opioid addiction and using Suboxone. Three months after Alice's birth, while under investigation by the Department, Mother was arrested on three felony drug charges, for which she pleaded "guilty" and was incarcerated. During the arrest, Mother admitted to having used methamphetamines. Mother's incarceration left the children with Father, who had a criminal record and history of drug abuse. After Mother was released from jail, while she still was under investigation by the Department, she was arrested for public intoxication, failure to identify, and exploitation of the elderly. When the children – all under the age of five — were in Mother's care, she left them at home alone. Devin suffered severe tooth decay in his Mother's care and Jamie developed speech and behavioral problems. The evidence also showed Mother moved frequently between residences. The caseworker (Paul) testified Mother gave her four addresses in the course of the investigation. At the time of trial, Mother did not know when she would be released from jail.

Considered in the light most favorable to the trial court's finding, the evidence is legally and factually sufficient to support the trial court's determination that termination of Mother's parental rights was justified under section 161.001(b)(1)(E) of the Family Code. We overrule Mother's second issue.

Because the record contains legally and factually sufficient evidence to support the trial court's findings under section (E), we need not address Mother's arguments that the evidence is insufficient to support the trial court's findings under section 161.001(b)(1)(O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."). Thus, we need not and do not reach Mother's first issue.

## C.    Best Interest of the Children

Texas courts presume that keeping children with their natural parent serves the children's best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department carries the burden of rebutting that presumption. *Id.* Proof of acts or omissions under section 161.001(b)(1) is probative of the best-interest issue. *See In re S.R.*, 452 S.W.3d at 366. The considerations the trier of fact may use to determine the best interest of the children, known as the *Holley* factors, include:

> (1) the desires of the children;

> (2) the present and future physical and emotional needs of the children;

> (3) the present and future emotional and physical danger to the children;

> (4) the parental abilities of the persons seeking custody;

> (5) the programs available to assist those persons seeking custody in promoting the best interest of the children;

14

(6) the plans for the children by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parent's willingness and ability to provide the children with a safe environment). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

### 1. Needs of and Danger to the Child

A parent's drug use supports a finding that termination of parental rights is in the best interest of the child. *In re E.R.W.*, 528 S.W.3d at 266. The fact finder can give "great weight" to the "significant factor" of drug-related conduct. *Id*. Mother's drug history includes admitted use of opioids and methamphetamines, use of Benzodiazepine when pregnant, an arrest for public intoxication, and a felony arrest for possession of methamphetamines. Aunt testified that Father believed Mother was addicted to pills. Caseworker Paul testified that Mother often missed required drug tests. Mother's repeated drug-seeking behavior indicates a course of conduct the fact finder reasonably have could concluded endangered the children's well-being. *Id*.

### 2. Child's Desires and Stability of the Home or Proposed Placement

Mother contends there is no evidence about the desires of the children. When children are too young to express their desires, the factfinder may consider circumstances, for example that the child has bonded with the foster family, is well

cared for in the current placement, and has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Jamie's foster parents have enrolled her in therapy for her speech and behavioral problems. Evidence showed improvements in Jamie's behavior since beginning therapy. During visits with Mother, Jamie would sit by herself and not interact with the family. Devin has received oral surgery to address his tooth decay. Alice was removed from Mother's care when she was three months old and has not been in Mother's care since.

The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in a child's best interest. *See In re E.R.W*, 528 S.W.3d at 267. Texas courts recognize as a paramount consideration in the best-interest determination the child's need for a "stable, permanent home." *See In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the child is relevant to the best-interest determination. *See C.H.*, 89 S.W.3d at 28. A fact finder may infer from a parent's past inability to meet the child's physical and emotional needs an inability or unwillingness to meet the child's needs in the future. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Mother has not shown an ability to maintain a residence for even a short time or to refrain from criminal activity. The current foster placement allows all three children to be together and the foster family has indicated a willingness to provide a long-term placement.

### 3. Parental Abilities and Plans for the Child by Those Seeking Custody

The factfinder may consider a parent's parenting skills in a best-interest analysis. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no

pet.). Mother contends that she has completed parenting classes and has a great deal of love and affection for her children. Though evidence shows Mother has completed a parenting class, evidence also shows that Mother has continued to engage in criminal conduct since taking the class. Within one year of the children's return to Mother after the initial removal, the Department received neglectful-supervision allegations and Mother was arrested on drug-related charges. Whatever parenting abilities Mother may have acquired in the class have not transferred to her day-to-day living and interactions.

### 4. *Availability of Programs to Assist Those Seeking Custody in Promoting the Child's Best Interest*

The record reflects that Mother took advantage of the parenting classes offered by the Department. Mother also completed some of the tasks on the service plan. Yet, the fact finder was free to conclude that Mother had not, and likely would not in the future, implement lasting change in her lifestyle, despite the services offered.

Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in the children's best interest. *See In re E.R.W.*, 528 at 267–68 (considering the mother's drug history and inability to provide a stable home in holding the evidence supported the best-interest finding). We overrule Mother's third issue.

## III. CONCLUSION

Having concluded the evidence is legally and factually sufficient to support the trial court's termination of Mother's parental rights under section 161.001(1)(E) and that termination is in the children's best interest, we conclude that the record

17

evidence supports the trial court's judgment. We affirm the judgment of the trial court.

/s/    Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Boyce and Busby.